**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

---

**SECURITIES AND EXCHANGE COMMISSION,**

    **Plaintiff,**

        **v.**

**MICHAEL MOONEY,**
**BRITT WRIGHT, and**
**PENNY FLIPPEN,**

    **Defendants.**

**Civil Action No. _____**

**JURY TRIAL DEMANDED**

---

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission" or "SEC"), alleges the following:

## OVERVIEW

1.    For more than a decade, John Woods ran a massive Ponzi scheme, raising over $100 million from more than 400 investors nationwide to invest in Horizon Private Equity, III, LLC ("Horizon III").

2.    Many of the victims were preyed upon by investment advisers at Livingston Group Asset Management Company d/b/a Southport Capital

("Southport"), a registered investment adviser firm owned and controlled by Woods.

3.      Woods and the Southport advisers made numerous false and misleading statements to clients to persuade them to invest in Horizon III.  Woods and the Southport advisers also failed to disclose the millions of dollars in investor funds that they personally received or used for their own benefit.  In doing so, Woods and the Southport advisers breached their core fiduciary duties.

4.      Michael Mooney ("Mooney"), Britt Wright ("Wright"), and Penny Flippen ("Flippen")—the Defendants in this case—are three such investment advisers.  They fueled the Ponzi scheme by recommending that advisory clients invest or maintain at least $62 million in Horizon III, representing more than half of the total funds invested in the Horizon III scheme.

5.      Mooney, Wright, and Flippen (collectively, the "Defendants") told clients that they would receive returns of 6-8% interest, guaranteed for two to three years, for non-specific investments in a fund called Horizon III.  The Defendants generally told investors that Horizon III would earn a return by investing their money in, for example, government bonds, stocks, or small real estate projects.  Investors were not told that their money would or could be used to pay returns to earlier investors.

-2-

6.      That is exactly what happened though, and Horizon III was only able to pay the guaranteed returns to existing investors by raising and using new investor money.  Horizon III did not earn any significant profits from legitimate investments; instead a very large percentage of purported "returns" to earlier investors were simply paid out of new investor money.

7.      Many of the clients who invested in Horizon III told the Defendants that they wanted an investment with little to no risk, and the Defendants falsely assured them that their money was safe in Horizon III and advised them to put a significant portion of their assets into the fund.  Each of the Defendants received undisclosed compensation from Horizon III, and when recommending and advising clients on Horizon III, the Defendants relied entirely on Woods' unsubstantiated claims about the fund's investment objectives, source of returns, and operations.

8.      Additionally, Mooney had knowledge of facts that conflicted with Woods' representations about the operations of Horizon III but ignored all signs and red flags that something was awry with the fund.

9.      Wright and Flippen, apart from Horizon III, had never offered private investments to their clients, lacked even a basic understanding of the purported investment that they were offering to their clients, and ignored multiple red flags indicative of a Ponzi scheme and the risks associated with investing in Horizon III.

10.     Nevertheless, over a period of several years, the Defendants continued to recommend that many of their advisory clients invest in Horizon III.  These clients placed their trust in the Defendants, and are now suffering the consequences of lost retirement and other savings as a result.

11.     In August 2021, the Commission charged Woods, Horizon III, and Southport with multiple violations of the federal securities laws.  This case represents the Commission's ongoing effort to hold accountable the people responsible for this egregious fraud.

## **VIOLATIONS**

12.     The Defendants have engaged in acts or practices, or aided and abetted, and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute, or will aid, abet and cause violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)]; and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v]; Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)]; and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for disgorgement plus prejudgment interest, for civil penalties, and for other equitable relief.

14.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v]; Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]; Section 214 of the Advisers Act [15 U.S.C. § 80b-14(a)]; and 28 U.S.C. § 1331.

15.     Venue is proper in this Court under Section 22(a) of the Securities Act [15 U.S.C. § 77v], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1391.

16.     Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

17.    Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act, the Exchange Act, and the Advisers Act occurred in the Northern District of Georgia.  Among other things, the Defendants recommended that clients invest in and they sent investor paperwork to Horizon III, which has its principal place of business located in this judicial district; they received undisclosed compensation from Horizon III, which has its principal place of business located in this judicial district; they communicated about Horizon III with Woods, who resides in this judicial district and ran the fraudulent scheme from within this judicial district; certain investors in Horizon III who were defrauded reside in this judicial district, including clients of the Defendants; and Mooney resided and worked on Horizon III matters in this judicial district during at least a portion of the relevant time period.

18.    Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## **DEFENDANTS**

19.    **Michael Mooney**, age 52, is a resident of Sarasota, FL.  Mooney is a minority owner of Southport, holds a Series 66 securities license, and was an

investment adviser representative of Southport from 2010 until 2021.  He

previously held Series 7 and 65 securities licenses.  Mooney is Woods' cousin and

worked with him at a dually registered investment adviser and broker-dealer before

joining Southport ("the Institutional Investment Adviser").  Mooney has been in

the securities industry since 1997, and has been associated with a number of SEC-

registered investment advisers and broker-dealers.

20.    **Britt Wright**, age 49, is a resident of Pfafftown, NC.  Wright was an

investment adviser representative of Southport from 2013 until 2021.  Wright

holds a Series 65 license and has been in the investment industry since 2001.  He

previously held Series 7 and 63 securities licenses.  Before joining Southport, he

worked as an investment adviser representative at two other advisory firms.

21.    **Penny Flippen**, age 59, is a resident of Mount Airy, NC.  Flippen was

an investment adviser representative for Southport from 2013 until 2021.  She has

worked in the securities industry since 1996 and has held Series 6, 7, 63, and 65

securities licenses.  Prior to joining Southport, Flippen was a registered

representative associated with a registered broker-dealer.

## **RELEVANT THIRD PARTIES**

22.    **John J. Woods**, age 56, is a resident of Marietta, Georgia.  Woods

had been the majority owner and in control of the operations of Southport since

approximately 2008.  From 2008 to 2016, Woods concealed his ownership of and

control over Southport because, during that time, he was a registered representative

at the Institutional Investment Adviser, which was unaware of his involvement

with Southport.

23.    In August 2021, the Commission charged Woods with multiple counts

of securities fraud based on his role in orchestrating the Ponzi scheme.  That case is

styled *SEC v. Woods, et al.*, Civil Action No. 1:21-cv-3413-SDG (N.D. Ga.).

24.    **Livingston Group Asset Management Company d/b/a Southport**

**Capital** is a Delaware corporation with its principal place of business in

Chattanooga, Tennessee.  During the relevant time period, Southport was an SEC-

registered investment adviser with reported assets under management of $824

million (as of March 2021).  Woods was the President and majority owner of

Southport.  Southport is a defendant in the case captioned *SEC v. Woods, et al.*,

Civil Action No. 1:21-cv-3413-SDG (N.D. Ga.).

25.    **Horizon Private Equity, III, LLC** is a Georgia limited liability

company with its principal place of business in Atlanta, Georgia that was formed in

2007 with Woods as the company's registered agent.  Horizon III, which is not

registered with the Commission, is the vehicle through which the Ponzi scheme

raised more than $100 million from investors.  Woods was, during the relevant

-8-

time period, an authorized signatory on the bank accounts of Horizon III into which investor funds were deposited, and he ultimately controlled the use and disposition of those funds.

26.    Horizon III is also a defendant in the case captioned *SEC v. Woods, et al.*, Civil Action No. 1:21-cv-3413-SDG (N.D. Ga.).  The Court appointed a receiver over Horizon III on September 1, 2021.

## THE HORIZON III PONZI SCHEME

### A.    Overview of the Horizon III Ponzi Scheme

27.    In November 2007, Woods formed Horizon III as its sole member and agent.  From November 2007 until the Court appointed a receiver over Horizon III in September 2021, Woods controlled Horizon III, its bank accounts, and the ultimate disposition of funds in the Horizon III bank accounts.  In short, Horizon III was the alter ego of Woods.

28.    In or around September 2008, Woods purchased Southport and he functioned as the controlling shareholder of Southport until the Commission filed suit against him in 2021.  At the time he purchased Southport, Woods was employed as a registered representative and investment adviser representative with the Institutional Investment Adviser.

29.    Between 2008 and 2021, Woods and Southport advisers used their

positions as fiduciaries to cultivate trusted advisory relationships with clients, and then convinced those clients to invest in Horizon III.

30.     The Horizon III investor base was largely comprised of elderly and inexperienced investors who sought safe investment opportunities for their assets, a large percentage of which were earmarked for retirement.

31.     Many of Horizon III's investors had long-standing relationships with their advisers, including the Defendants, before being solicited to invest in Horizon III.  These investors placed trust in the recommendations of those advisers, including the Defendants.

32.     Woods and the Defendants led investors to believe their funds would be used to purchase safe investments.  Woods and the Defendants told investors that the Horizon III investment was very safe, that it would pay a guaranteed rate of return, and that clients could get their principal back without penalty.

33.     In reality, Horizon III has earned very few profits from investments. Instead, investor proceeds were used primarily to make principal and interest payments to earlier Horizon III investors and to fund Woods' personal projects, such as his purchase of a minor league baseball team.

34.     Woods and the Defendants did not tell investors in Horizon III—most if not all of whom were clients to whom they owed a fiduciary duty—that investor

funds would or could be used to make payments to earlier investors, either for the payment of interest or for the return of principal.

35.     As a registered investment adviser, Southport and its individual employees, including the Defendants, owed their clients a fiduciary duty to act in their clients' best interest and to disclose any conflicts of interest to their clients. This included the Defendants' receipt of compensation paid by Horizon III.

36.     Southport administrative personnel facilitated the mechanics of the Horizon III investments.  Once an investor purchased a membership interest in Horizon III, Southport administrative staff assisted the investor in setting up an account (typically a self-directed IRA) at an independent custodial trust company (the "Trust Company").  After the investor's account at the Trust Company was funded, the investment principal was, at the direction of Woods, transferred to Horizon III's bank accounts.  Southport administrative employees tracked the outstanding principal of each Horizon III investor and the periodic interest due to each investor, and provided this information to Woods monthly.

37.     Woods then transferred a lump sum to the Trust Company and sent an e-mail to the company setting out how it should allocate the funds to each Horizon III investor's account at the Trust Company.

38.    Horizon III investors received periodic account statements that were generated and sent to investors by Southport administrative employees.  The account statements reflected the investor's Horizon III principal investment and the interest payments received both during the period and over the life of the investment.

39.    When it first established a relationship with the Trust Company in 2015, Woods and Southport directed the Trust Company to deposit new investor funds to bank accounts in the name of Horizon III.

**B.    The Ponzi Scheme was Massive**

40.    Because of the length of time Woods has been running the Ponzi scheme, the Commission has not yet fully determined the scope of the fraud. Nevertheless, the Commission has analyzed in detail investments and transactions from January 1, 2019, through August 2021.  Those analyses show that the Ponzi scheme involved more than $100 million.

41.    Between January 1, 2019, and August 2021, Horizon III used accounts at Bank of America and IBERIABANK (the "Horizon Accounts") to receive money from and send money to Horizon III investors.  On January 1, 2019, the Horizon accounts had a combined balance of approximately $47,777.

42.    From January 1, 2019 to May 28, 2021, Horizon III received approximately $49 million in deposits in the Horizon Accounts.  Of that amount, more than $40 million was deposited by the Trust Company and represented new investor money.  In other words, only approximately $9 million was deposited in the Horizon Accounts from sources other than investors.

43.    During that same period, Horizon III withdrew or transferred approximately $48 million from the Horizon Accounts.  Of that amount, more than $21 million was sent to the Trust Company for interest payments to investors and/or returns of investor capital.

44.    Without the $40 million in new investor money, Horizon III would not have had enough money for the $21 million in interest payments and returns of investor capital that it made during the period from January 1, 2019, through May 28, 2021.

45.    Of the deposits that came into the Horizon Accounts from sources other than new investors, very few represented profits from investments.  Instead, large sums of money (that largely cancel each other out) flowed to and from various real estate projects in which Woods arranged for Horizon III to invest.  Several of those large, round-trip transfers represented up-front loans made by

Horizon III for real estate projects that were repaid once the project obtained traditional financing.

46.    The records for the period also reflect millions of dollars in payments sent to and received from an insurance brokerage company of which Woods is the majority owner.

47.    The pattern described above holds true when looking at specific months—interest and principal payments were necessarily funded with new investor money.  For example, on April 1, 2021, Horizon's IBERIABANK account had a balance of $684,024.  That amount includes $250,000 deposited from an investor on March 31, 2021, $100,000 deposited from an investor on March 29, 2021, and $50,000 from two other investors that same day.  In other words, at least $400,000 of the money in Horizon III's bank account at the beginning of April 2021 was new investor money.

48.    During April 2021, the Trust Company deposited $1,377,200 in new investor funds in the IBERIABANK account.  That amount represents 99% of the funds deposited into the account during that month.

49.    Also during the month of April 2021, Horizon transferred $725,335 from the IBERIABANK account to the Trust Company for payments to existing investors.

50.    Without the deposits of new investor money referred to above, Horizon would not have had enough money to make interest payments to investors in April 2021.

51.    As of the end of July 2021, Horizon owed investors more than $110 million in principal.  At that time, however, Horizon had liquid assets worth less than $16 million.  The majority of the other Horizon assets of which the Commission is aware are fractional ownership interests in small real estate projects in various stages of development.  The Commission estimates that Horizon has invested less than $20 million in those projects, and liquidating them will be complicated, time consuming, and yield uncertain amounts.

## THE DEFENDANTS' CRITICAL
## ROLE IN THE HORIZON III PONZI SCHEME

### A.    The Defendants Sold Horizon III to Their Clients

52.    During their tenure at Southport, the Defendants used their positions as fiduciaries to cultivate and maintain trusted advisory relationships with clients and then convinced those clients to invest in Horizon III.

53.    Their clients included elderly and inexperienced investors who sought safe investment opportunities for their assets, a large percentage of which were earmarked for retirement.

54.    Many of the investors had invested in Horizon III based on the recommendation of one of the Defendants.

55.    Many of these investors had long-standing relationships with one of the Defendants before being solicited to invest in Horizon III and placed trust in the recommendations of their adviser.

56.    Other Horizon III investors were referred to one of the Defendants by friends or family because of the apparent success of the investment.

57.    The Defendants continued to advise clients regarding their Horizon III investment during regular meetings.

58.    The Defendants advised clients to keep their funds invested in Horizon III.

59.    In total, the Defendants' clients' had invested or maintained investments of at least $62 million in Horizon III.

60.    Mooney first began recommending Horizon III to his clients in 2008, when he worked alongside Woods at the Institutional Investment Adviser.

61.    In 2010, Mooney left the Institutional Investment Adviser for Southport, where he continued to recommend Horizon III to his own clients as well as clients of other Southport investment adviser representatives.  In later years, Mooney would act as the de facto sales manager for Horizon III.

-16-

62.     As of July 2021, Mooney's clients or clients with whom he interacted had over $27 million invested in Horizon III.

63.     Wright and Flippen began recommending Horizon III to their advisory clients when they joined Southport in 2013.

64.     By the time Wright left Southport in September 2021, his clients or clients with whom he interacted had over $25 million invested in Horizon III.

65.     Flippen had a smaller book of business than Wright, but as of July 2021, her clients or clients with whom she interacted had over $10 million invested in Horizon III.

**B.      The Defendants Received Undisclosed Compensation from Horizon III**

**1.      Compensation Received From the Sale of Horizon III**

66.     Horizon III was a significant source of compensation for the Defendants.

67.     Although Southport employed the Defendants, Horizon III paid them more money than Southport did.

68.     Woods told the Defendants that he would arrange for Horizon III to make these payments to them instead of Southport to avoid paying payroll taxes.

69.     Beginning in 2010, Horizon III paid Mooney salary-like payments of $12,500 a month, or $150,000 a year.

70.     Mooney also received one-time commissions of 1.7% to 2% on new money he brought into Horizon III.

71.     From 2013 to 2021, Mooney received over $1.9 million in payments from Horizon III, over $878,000 (or 46%) of which appear to be commissions from his clients or clients that he interacted with investing in Horizon III.

72.     In April 2013, Wright began working for Southport as an investment adviser representative, in part because he was intrigued by Horizon III, which offered clients a 6% return with no fluctuation in value.

73.     Wright received compensation from Horizon III beginning in 2013.

74.     Starting in 2014, Horizon III paid Wright salary-like payments of $7,000 a month, or $84,000 a year.

75.     In 2019, Wright took on a larger role in managing Southport's Mount Airy office, and Horizon III began paying Wright an annual lump sum of $30,000 in addition to his monthly payments, so that Wright was receiving a total of $114,000 a year from Horizon III.

76.     In April 2021, Wright requested (and received) an advance of $150,000 from Horizon III, with the understanding that he would forego his $30,000 annual payments for the next five years.

77.    By the time Wright left Southport, around 40% of his clients' assets under management, excluding annuities, were invested in Horizon III.

78.    In total, Wright received over $870,000 from Horizon III between 2013 and 2021.

79.    In March 2013, Flippen joined Southport after her former boss sold his book of business to Woods.

80.    While at Southport, Flippen advised clients on Horizon III and processed investor paperwork for, among other things, her clients' Horizon III investments.

81.    Beginning in 2013, Horizon III paid Flippen $3,000 a month, or $36,000 a year.

82.    In total, Flippen received over $287,000 from Horizon III between 2013 and 2021.

### 2.    Defendants Failed to Disclose their Compensation from Horizon III to Clients

83.    The Defendants failed consistently to disclose to clients the payments they received from Horizon III, even though those payments created a conflict of interest.

84.     Mooney did not disclose his compensation with clients at all or, if he did discuss it with clients, he falsely told them that Horizon III would have to make returns greater than the fixed interest rate promised to investors in order to collect fees and pay him.

85.     Mooney never disclosed any conflicts of interest to clients when offering investments in Horizon III to them.

86.     Like Mooney, Wright never told his clients that Horizon III was paying a significant portion of his compensation.

87.     Wright has acknowledged that his clients would probably be surprised to learn that he received $7,000 a month from Horizon III.

88.     Flippen only told clients about her Horizon III compensation if they specifically asked about it, which was not always the case.

**C.     The Defendants Misrepresented The Risks And Returns Associated With Horizon III**

89.     The Defendants each made numerous false and misleading statements to investors in Horizon III, most (if not all) of whom were advisory clients to whom they owed a fiduciary duty.

90.     Each of the Defendants made material misrepresentations to Horizon III investors, including but not limited to the following:

a. Investor funds would be used exclusively to purchase government bonds, collateralized mortgage obligations, real estate, or similar investments;

b. Returns to investors would be paid from profits of Horizon III's investments;

c. Horizon III guaranteed a fixed rate of return for a specified period of time;

d. Horizon III investments carried little risk and were extremely safe; and

e. Investors could not lose their principal investment in Horizon III.

91.    In reality, Horizon III earned very few profits between 2008 and 2021.

92.    Instead, contrary to the representations of Defendants, investor proceeds were used primarily to make principal and interest payments to earlier Horizon III investors, to compensate the Defendants, and for use by Woods.

**D.    The Defendants Recommended Horizon III Based Solely on Unsubstantiated Representations Made to Them by Woods**

93.    Although they were fiduciaries, the Defendants recommended Horizon III to their clients based solely on unsubstantiated representations made to them by Woods, and each Defendant failed to conduct any meaningful due diligence involving Horizon III's purported investment strategy and ignored red flags, such as Woods instructing the Defendants not to use their Southport email addresses when communicating about Horizon III.  In addition, the Defendants told investors that the

Horizon III fund carried little risk and was safe without any factual predicate for making such statements.

94.     Mooney had never heard of any investment that offered a rate of return and level of risk similar to those promised by Horizon III.

95.     As Mooney has acknowledged, he "didn't look under the . . . hood" and "just trusted" Woods.

96.     Mooney was aware though of specific facts that conflicted with representations made to him by Woods, and over time, Mooney consistently avoided asking even the most basic questions about Horizon III's structure and operations that would have revealed its fraudulent nature despite continuing to solicit new investors in Horizon III.

97.     For example, in 2008, Woods had told Mooney that he purchased Southport directly for Horizon III, but Woods did not identify Southport as a Horizon III asset when he recruited Mooney to solicit Horizon III investors that same year.

98.     Around 2012, Mooney learned that Horizon III owned Southport, but despite the fact that his clients had invested millions of dollars in Horizon III, Mooney never asked Woods why Horizon III purchased Southport or why Woods did not tell him about it.

99.     Additionally, between 2012 and 2018, Horizon III purchased several registered investment advisory firms for Southport.  Mooney participated in these acquisitions.  Although Mooney understood that one of Woods' clients managed Horizon III, and Mooney did not understand himself to have signature authority for Horizon III, Mooney signed at least three of the purchase agreements as Horizon III's member.

100.    Mooney also personally guaranteed three or four of the notes Horizon III issued to sellers pursuant to these agreements.

101.    Mooney signed the documents at Woods' request without understanding, or even questioning, why he was being asked to do so.

102.    Like Mooney, Wright and Flippen were not aware of any other comparable investments that offered rates similar to Horizon III.

103.    In fact, Wright joined Southport in part because no other firm offered any investment like Horizon III.

104.    Wright and Flippen never questioned or conducted any meaningful review regarding how Horizon III was able to find a unique mix of principal-protected investments that paid investors regular returns of at least 6%, especially when they believed it held underlying investments that only paid 2% to 3% interest.

105.    Additionally, Wright and Flippen never saw any documentation to corroborate what Woods told them about Horizon III's investments, and when they asked Woods for documentation on the fund, he provided a number of differing, highly implausible excuses as to why he could not provide it.  Despite all of this, neither Wright nor Flippen took any steps to understand how Horizon III was able to generate its purportedly guaranteed returns.

106.    For example, when Wright asked Woods for a list of Horizon III's investments, Woods told him that if he gave Wright a list, Wright would have to be "included in the operations of the fund."

107.    When Flippen asked Woods for a list of Horizon III's bonds, Woods told her that because Horizon III had invested in a large number of bonds and had minimal staff, there was no such list, and there was no way to get one.

108.    On other occasions when Flippen asked Woods about Horizon III documentation, Woods told her Horizon III did not have documentation because private equity was different than publicly traded securities.

109.    In contrast to Wright and Flippen, who recklessly accepted Woods' refusal to provide documentation of Horizon III's underlying assets, another Southport investment adviser representative chose not to recommend Horizon III to

his clients after Woods refused to provide him with basic information regarding Horizon III's investments.

110.    Neither Wright nor Flippen had previously offered private investments to their clients, and they did not understand at even a basic level the type of investment they were offering.  Yet they consistently recommended that advisory clients invest in Horizon III anyway or keep their money invested in the fund.

111.    Both Wright and Flippen thought Horizon III was "private equity," but neither did any research into the typical characteristics of a private equity investment or otherwise to understand the details of the investment that they were recommending to advisory clients.

112.    When Wright asked Woods if Horizon III had disclosure documents, Woods told him that Horizon III was private equity, not a mutual fund, and there were no disclosure documents because what the fund offered was "fixed."

113.    At some point, Wright and Flippen saw a booklet for Horizon III, but Woods said it concerned common units in Horizon III, not the preferred units they offered.  Wright and Flippen never asked why Horizon III had a booklet for the sale of common units but not preferred units if, as Woods told them, private investments did not have documentation, and neither of them did any research into the types of documents commonly provided to private fund investors.

114.   Although their clients' subscription agreements referenced a private placement memorandum, Wright and Flippen never asked for it, and neither knew what a private placement memorandum was.

## COUNT I – FRAUD

**Violations of Section 17(a)(1) of the Securities Act**
**[15 U.S.C. § 77q(a)(1)]**
**(All Defendants)**

115.   Paragraphs 1 through 114 are hereby realleged and incorporated herein by reference.

116.   Between in or around 2012 and the present, the Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

117.   The Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

118.   While engaging in the course of conduct described above, the Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

119.    By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II – FRAUD

**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**
**(All Defendants)**

120.    Paragraphs 1 through 114 are hereby realleged and incorporated herein by reference.

121.    Between in or around 2012 and the present, the Defendants, acting knowingly, recklessly, or negligently in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

   a.    obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   b.    engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

122.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Subsections (a), (b), and (c) of Rule 10b-5
thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)]
(All Defendants)**

123.    Paragraphs 1 through 114 are hereby re-alleged and are incorporated herein by reference.

124.    Between in or around 2012 and the present, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a.    employed devices, schemes, and artifices to defraud;

    b.    made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities;

all as more particularly described above.

125.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

126.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## COUNT IV – FRAUD

### Violations of Section 206(1) of the Advisers Act
### [15 U.S.C. § 80b-6(1)]
### (All Defendants)

127.    Paragraphs 1 through 114 are hereby realleged and are incorporated herein by reference.

128.    From at least 2012 through the present, Defendants, acting as investment advisers, using the mails and the means and instrumentalities of interstate commerce, directly and indirectly, employed devices, schemes and artifices to

defraud one or more advisory clients and/or prospective clients.

129.   The Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.  In engaging in such conduct, the Defendants acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

130.   By reason of the foregoing, the Defendants, directly and indirectly, have violated, and, unless enjoined, will continue to violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT V – FRAUD

### Violations of Section 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(2)]
### (All Defendants)

131.   Paragraphs 1 through 114 are hereby realleged and are incorporated herein by reference.

132.   From at least 2012 through the present, the Defendants, acting as investment advisers, by the use of the mails and the means and instrumentalities of interstate commerce, directly and indirectly, engaged in transactions, practices, and courses of business which would and did operate as a fraud and deceit on one or more advisory clients and/or prospective clients.

133.   By reason of the foregoing, the Defendants, directly and indirectly,

-30-

have violated and, unless enjoined, will continue to violate Section 206(2) of the

Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT VI – AIDING AND ABETTING (FRAUD)

**Aiding and Abetting Violations of Section 17(a) of the Securities Act
[15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder
[17 C.F.R. § 240.10b-5(a), (b), and (c)]
(All Defendants)**

134.    Paragraphs 1 through 114 are realleged and incorporated by reference

herein.

135.    As alleged above, Woods, Southport, and Horizon III violated Section

17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §

240.10b-5(a), (b), and (c)].

136.    Defendants knew, or recklessly disregarded, that Woods', Southport's,

and Horizon III's conduct was improper and knowingly rendered to them substantial

assistance in this conduct.

137.    By reason of the foregoing, Defendants aided and abetted violations of

and, unless enjoined, will continue to aid and abet violations of Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## COUNT VII – AIDING AND ABETTING (FRAUD)

**Violations of Sections 206(1) and 206(2) of the Advisers Act
[15 U.S.C. §§ 80b-6(1), 80b-6(2)]
(All Defendants)**

138.    Paragraphs 1 through 114 are realleged and incorporated by reference herein.

139.    As alleged above, Woods and Southport violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

140.    Defendants knew, or recklessly disregarded, that the conduct of Woods and Southport was improper and knowingly rendered substantial assistance to them in this conduct.

141.    By reason of the foregoing, Defendants aided and abetted violations of and, unless enjoined, will continue to aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

## PRAYER FOR RELIEF

The Commission respectfully requests that this Court:

1.    Find that Defendants committed the violations alleged;

2.    Permanently enjoin Defendants and each of their agents, employees,

and attorneys, and any other person or entity in active concert or participation with them who receives actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in conduct in violation of the following provisions:  Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]; and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1)-(2)];

3.      Order Defendants to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, plus pay prejudgment interest thereon;

4.      Order Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] in an amount to be determined by the Court;

5.      Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all order and decrees that may be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court; and

6.    Order such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY TRIAL DEMAND

The Commission demands a trial by jury as to all issues that may be so tried.

Dated:  June 10, 2022          Respectfully submitted,

/s/ Harry B. Roback
M. Graham Loomis (GA Bar No. 457868)
Harry B. Roback (GA Bar No. 706790)
950 East Paces Ferry Rd. NE, Suite 900
Atlanta, GA 30326
Telephone:  (404) 942-0690
Facsimile:  (404) 842-7679
robackh@sec.gov

Attorneys for Plaintiff