## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

                  v.

MICHAEL MOONEY, *et al.*,

    Defendants.

Civil Action No.
1:22-cv-02320-SDG

## OPINION AND ORDER

This case is before the Court on the Securities and Exchange Commission's consolidated motion for remedies against Defendants Michael Mooney, Britt Wright, and Penny Flippen [ECF 57]. For the following reasons, the SEC's motion is **GRANTED**, although not for the total amount of civil penalties requested as to Defendants Wright and Flippen.

## I.    Procedural Background

This is a civil enforcement action brought by the SEC against Mooney, Wright, and Flippen for their roles in a Ponzi scheme run by John Woods involving a private equity fund named Horizon Private Equity III, LLC (Horizon III). Defendants were investment advisers associated with Southport Capital, a registered investment adviser firm owned by Woods. The SEC filed its complaint on June 10, 2022.[1] It asserts seven claims against Defendants for violations of:

---

[1]    ECF 1.

Sections 17(a)(1), (2), and (3) of the Securities Act of 1933 (Counts I–II); Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (Count III); Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (Counts IV–V); as well as claims for aiding and abetting violations of these provisions by Woods and Southport (Counts VI–VII).

After the close of discovery, Wright and Flippen entered into bifurcated settlements with the SEC, by which they agreed to the entry of judgment against them for the injunctive relief sought by the SEC but reserving for later the determination on any monetary remedies sought by the SEC.[2] The SEC moved for summary judgment against Mooney on January 30, 2024, but before the Court ruled on the motion, the SEC and Mooney entered into a bifurcated settlement as well.[3] The SEC filed its consolidated motion for remedies against all Defendants on April 17.[4] The Court held oral arguments on the motion on February 3 and 6, 2025, at least part of which included hearing proffered or sworn testimony from each of the Defendants.

---

[2]    ECF 42.

[3]    ECFs 47, 53.

[4]    ECF 57.

## II.    Factual Background

In the bifurcated settlements, Defendants agreed that for the purposes of this motion the allegations in the complaint are to be accepted as true.[5] Defendants also agreed that the Court may consider other affidavits, declarations, sworn testimony, and documentary evidence in deciding this motion.[6]

Woods formed Horizon III in November 2007 and controlled it from its inception until it was put into receivership by the Court in September 2021.[7] Woods also purchased Southport in or around September 2008 and functioned as its controlling shareholder until the SEC filed suit in 2021.[8]

Between 2008 and 2021, Woods and Southport advisers convinced their advisory clients to invest in Horizon III.[9] Many of these investors were elderly or inexperienced investors seeking safe investments for their retirement assets.[10] Woods and Defendants told their clients that Horizon III was an extremely safe investment that would pay a guaranteed rate of return of 6–8% interest from Horizon III's investments in government bonds, stocks, or small real estate

---

[5]    Consent of Wright, ECF 42-1, ¶ 3; Consent of Flippen, ECF 42-2, ¶ 3; Consent of Mooney, ECF 53-1, ¶ 3.

[6]    *Id.*

[7]    ECF 1, ¶ 27.

[8]    *Id.* ¶ 28.

[9]    *Id.* ¶ 29.

[10]    *Id.* ¶ 30.

projects; clients were told that their funds would be used exclusively to make these types of investments, and investors' guaranteed returns would be paid from the profits of these investments.[11] Clients were also told that they could not lose their principal investment and could get their principal back without penalty.[12] However, Horizon III was not particularly profitable, and investor proceeds were primarily used to make principal and interest payments to earlier Horizon III investors, as well as for Woods's personal projects.[13] Woods and Defendants did not tell the investors that their investments may be used to pay back earlier investors.[14] Nor did Defendants fully disclose to their clients that they (Defendants) were being compensated by Horizon III.[15] Defendants ignored numerous red flags regarding the scheme, including Woods's instruction for Defendants to use their personal email addresses to discuss Horizon III.[16]

The Horizon III scheme involved more than $100 million.[17] At the end of July 2021, Horizon III owed $110 million in principal to its investors but had liquid

---

[11] *Id.* ¶¶ 5, 90.

[12] *Id.* ¶¶ 32, 90.

[13] *Id.* ¶ 33.

[14] *Id.* ¶ 34.

[15] *Id.* ¶ 35.

[16] *See, e.g., id.* ¶ 93.

[17] *Id.* ¶ 40.

assets of only $16 million, as well as approximately $20 million in illiquid investments.[18]

### A.    Defendant Michael Mooney

Mooney is Woods's cousin and was formerly an investment adviser representative holding Series 7 and 65 securities licenses.[19] Mooney also worked with Woods at an unnamed investment adviser/broker-dealer—which the record shows was Oppenheimer & Co.[20]—before joining Southport in 2010.[21] Mooney began recommending Horizon III to clients in 2008 while working with Woods at Oppenheimer.[22] After joining Southport, Mooney continued to recommend Horizon III to his clients as well as to clients of other Southport advisers, and later served as a *de facto* sales manager for Horizon III.[23] As of July 2021, Mooney's clients had more than $27 million invested in Horizon III.[24]

---

[18]    *Id.* ¶ 51.

[19]    *Id.* ¶ 19.

[20]    *See* Wright and Flippen's Opp'n Br., Ex. C (Woods's Sentencing Mem. in *United States v. Woods*, Case No. 1:23-cr-00064-SEG-1 (N.D. Ga.)), ECF 60-3, at 8–9.

[21]    ECF 1, ¶ 19.

[22]    *Id.* ¶ 60.

[23]    *Id.* ¶ 61.

[24]    *Id.* ¶ 62.

Mooney received salary-like payments of $150,000 per year from Horizon III.[25] He also received commissions on money brought into Horizon III, totaling over $878,000.[26] Woods told Mooney and the other Defendants that this compensation arrangement was made for Southport to avoid paying payroll taxes.[27] Mooney did not disclose this compensation to his clients, and if asked he falsely told his clients that Horizon III would need to outperform its guaranteed rate of return for him to collect his compensation.[28]

Mooney acknowledged that he did not investigate Horizon III's claimed investment safety and profitability—despite being unfamiliar with any other investment with a comparable risk and return profile—but rather just trusted Woods.[29] However, at the same time, Mooney was aware of facts that conflicted with the representations made to him by Woods but did not question them.[30] For example, in 2008 Woods told Mooney that he purchased Southport as an asset for Horizon III, but Woods did not disclose to Mooney that Southport was a Horizon

---

[25]  *Id.* ¶ 69.

[26]  *Id.* ¶¶ 70, 71.

[27]  *Id.* ¶ 68.

[28]  *Id.* ¶ 84.

[29]  *Id.* ¶¶ 94, 95.

[30]  *Id.* ¶ 96.

III asset while recruiting Mooney.[31] In approximately 2012, Mooney learned that Horizon III owned Southport, but Mooney did not ask Woods why this was the case, or why Woods did not disclose this fact.[32] Between 2012 and 2018, Horizon III purchased several additional registered investment advisory firms for Southport, and Mooney signed at least three of the purchase agreements on behalf of Horizon III, though Mooney did not have signature authority for Horizon III; Mooney also personally guaranteed three or four notes issued by Horizon III to the sellers.[33]

### B.    Defendant Britt Wright

Wright was also formerly an investment adviser representative holding Series 7 and 63 securities licenses.[34] Wright joined Southport in 2013, in part because it offered investment opportunities in Horizon III.[35] When Wright left Southport in September 2021, his clients had more than $25 million invested in Horizon III.[36]

---

[31]  *Id.* ¶ 97.

[32]  *Id.* ¶ 98.

[33]  *Id.* ¶¶ 99, 100.

[34]  *Id.* ¶ 20.

[35]  *Id.* ¶ 72.

[36]  *Id.* ¶ 64.

Wright also received salary-like compensation from Horizon III of $84,000 per year.[37] In 2019, Wright took on the role of managing Southport's Mount Airy, North Carolina office, and Wright began receiving an additional $30,000 per year.[38] In April 2021, Wright was given an advance of $150,000 from Horizon III in place of his $30,000 payments over the following 5 years.[39] Wright did not disclose his Horizon III compensation to his clients.[40]

Before Horizon III, Wright had never offered private investments to his clients.[41] Wright never questioned how Horizon III could offer guaranteed returns of at least 6% when he understood the underlying investments to pay only 2–3% interest.[42] On several occasions, Wright asked Woods for a list of Horizon III's underlying investments, but each time he received a different answer and no list or other documentation.[43] Wright understood Horizon III to be "private equity," but he did not conduct any research into the characteristics of private equity investments.[44] The documents associated with Wright's clients' investments in

---

[37] *Id.* ¶ 74.

[38] *Id.* ¶ 75.

[39] *Id.* ¶ 76.

[40] *Id.* ¶ 86.

[41] *Id.* ¶ 9.

[42] *Id.* ¶ 104.

[43] *Id.* ¶¶ 106, 112, 113.

[44] *Id.* ¶ 111.

Horizon III referenced a private placement memorandum, but Wright never requested a copy of the memorandum, nor did he know what the memorandum was.[45]

### C.    Defendant Penny Flippen

Flippen was also formerly an investment adviser representative holding Series 6, 7, 63, and 65 securities licenses.[46] Flippen joined Southport in March 2013 after her former boss sold his business to Woods.[47] As of July 2021, Flippen's clients had more than $10 million invested in Horizon III.[48]

Flippen received salary-like compensation from Horizon III of $36,000 per year.[49] Flippen did not disclose this compensation to her clients unless asked, and not every client asked.[50]

Like Wright, Flippen had never offered private investments to her clients before Horizon III.[51] Nor did Flippen understand the characteristics of private equity investments in general, or Horizon III specifically.[52] Also like Wright,

---

[45]  *Id.* ¶ 114.

[46]  *Id.* ¶ 21.

[47]  *Id.* ¶ 79.

[48]  *Id.* ¶ 65.

[49]  *Id.* ¶ 81.

[50]  *Id.* ¶ 88.

[51]  *Id.* ¶ 110.

[52]  *Id.* ¶ 111.

Flippen asked Woods several times for information regarding Horizon III's underlying investments, but Flippen never received the necessary information and got similar excuses from Woods.[53] The documents associated with Flippen's clients' investments in Horizon III also referenced a private placement memorandum, but Flippen never requested a copy of the memorandum, nor did she know what the memorandum was.[54]

### D.    Other Relevant Background

In August 2021, the SEC filed a civil complaint against Woods, Southport, and Horizon III alleging eight counts of securities fraud.[55] In March 2023, the United States also brought a criminal wire fraud charge against Woods related to the Horizon III scheme.[56] Woods pleaded guilty to the wire fraud charge and was sentenced to 7 years and 11 months in prison.[57] Woods was also ordered to pay over $33 million in restitution.[58] In August 2024, the receiver appointed to oversee

---

[53] *Id.* ¶¶ 107, 108, 113.

[54] *Id.* ¶ 114.

[55] *SEC v. Woods*, Case No. 1:21-cv-03413-SDG (N.D. Ga.), ECF 1.

[56] *United States v. Woods*, Case No. 1:23-cr-00064-SEG-1 (N.D. Ga.), ECF 1.

[57] *United States v. Woods*, ECF 22.

[58] *United States v. Woods*, ECF 44.

the assets of Horizon III and certain other entities owned by Woods reported that Horizon III investors collectively suffered a net loss of over $68 million.[59]

## III.   Discussion

The bifurcated settlements all provide that "the Court **shall** order disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to" the Securities Act and the Exchange Act.[60] Defendants have agreed that "the **amounts** of the disgorgement and civil penalty shall be determined by the Court upon motion of the Commission," and Defendants are "precluded from arguing that [they] did not violate the federal securities laws as alleged in the Complaint."[61] The SEC requests that Mooney be ordered to disgorge $793,391 in commissions he received from Horizon III and pay $300,571 in prejudgment interest.[62] The SEC also asks the Court to impose on each Defendant a civil penalty of $230,464, equal to a statutory tier-three penalty.

### A.    Disgorgement

The Exchange Act permits the Court to "require disgorgement . . . of any unjust enrichment by the person who received such unjust enrichment as a result

---

[59]   *SEC v. Woods*, ECF 542.

[60]   Consent of Wright, ECF 42-1, ¶ 3; Consent of Flippen, ECF 42-2, ¶ 3; Consent of Mooney, ECF 53-1, ¶ 3 (emphasis added).

[61]   *Id.* (emphasis added).

[62]   The SEC is not seeking disgorgement from Wright or Flippen.

of such violation" of the securities laws. 15 U.S.C. §§ 78u(d)(3)(A), (d)(7). "The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) (collecting cases). Once the SEC produces a reasonable approximation, the burden shifts to the defendant to demonstrate that the SEC's estimate is unreasonable. *Id.* "Because disgorgement is remedial and not punitive, the court's power to order disgorgement 'extends only to the amount with interest by which the defendant profited from his wrongdoing.'" *SEC v. Phoenix Telecomm., L.L.C.*, 231 F. Supp. 2d 1223, 1225 (N.D. Ga. 2001) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978)).

The SEC arrived at the figure of $793,391 in commissions for Mooney based on the following calculations: between 2013 and 2021, bank records show that Mooney received $1,991,391 from Horizon III[63]; Mooney testified that he received a monthly salary of $12,500, paid by Horizon III,[64] for which the SEC does not seek disgorgement; Mooney stated in an interrogatory response that he received $48,000 in expense reimbursements from Horizon III,[65] for which the SEC does not

---

[63]  ECF 57-6, ¶ 11.

[64]  *Id.* ¶ 12.

[65]  *Id.* ¶ 13.

seek disgorgement; and Mooney admitted that he received commissions for placing and keeping client funds in Horizon III.[66]

The Court concludes that the SEC's disgorgement proposal is a reasonable approximation of Mooney's ill-gotten gains. The evidence presented shows that Mooney received consistent salary payments during the 2013–2021 period, and the SEC credited Mooney's written testimony that $48,000 of the Horizon III payments were expense reimbursements. The remaining $793,391 is a reasonable approximation of the additional profit Mooney received for recommending his clients to invest in the Horizon III scheme or dissuading them from withdrawing their money, and thus should be disgorged as ill-gotten gains.

### B.    Prejudgment Interest

The SEC is also seeking $300,571 in prejudgment interest on the funds to be disgorged by Mooney.[67] Whether to award prejudgment interest is left to the discretion of the district court. *See Werner Enters., Inc. v. Westwind Maritime Int'l, Inc.*, 554 F.3d 1319, 1328 (11th Cir. 2009). Because "awards of prejudgment interest are compensatory, not punitive . . . the district court should make its interest decision through 'an assessment of the equities.'" *SEC v. Lauer*, 478 F. App'x 550, 557–58 (11th Cir. 2012) (quoting *Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521,

---

[66]    *Id.* ¶ 14.

[67]    The SEC submitted its detailed prejudgment interest calculation at ECF 57-2.

1536 (11th Cir. 1987)). The Eleventh Circuit has previously approved the use of the IRS delinquent tax rate in calculating prejudgment interest. *See Lauer*, 478 F. App'x at 557–58 (collecting cases).

The SEC and Mooney previously agreed to the prejudgment interest calculation method in the bifurcated settlement, and the Court has ordered that "[p]rejudgment interest shall be calculated from June 11, 2017, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)."[68] In any case, the Court concludes that the prejudgment interest sought by the SEC is reasonable under the circumstances, as Mooney began profiting from Horizon III via commission payments in 2013 and continued to receive commissions through 2020.[69] *See SEC v. Merch. Cap., LLC*, 486 Fed. App'x. 93, 97 (11th Cir. 2012) ("Without prejudgment interest, the appellants would have benefitted from what in effect amounted to interest-free loans of the ill-gotten funds.").

The Court further concludes that the SEC's calculation would not lead to an inequitable result, as the interest award is not so excessive compared to the principal sum that the award would be punitive, and the award does not reflect

---

[68]  ECF 55, at ¶ 4. At oral argument, the SEC represented that the June 11, 2017 start date was chosen as the date because it is five years prior to the filing of the complaint.

[69]  *Id.* ¶ 16.

interest that would have accrued due to "delay[s] in bringing this suit to a conclusion" attributable to the SEC "or to delays inherent in the federal judicial system." *Osterneck*, 825 F.2d at 1536. The Court finds that the accrued interest being sought is reasonable considering the duration of Mooney's involvement in the Horizon III scheme. Accordingly, the Court will order that Mooney pay prejudgment interest in the amount of $300,571.

### C.    Civil Penalties

The Securities Act, the Exchange Act, and the Advisers Act—with nearly identical language—allow the SEC to seek civil penalties to be imposed by the Court. As relevant here, the Securities Act provides:

> [w]henever it shall appear to the Commission that any person has violated any provision of this subchapter, [or] the rules or regulations thereunder . . . the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation.

15 U.S.C. § 77t(d)(1).[70] To determine the amount of the penalty, the Acts outline three tiers based on the nature of the violation. *Id.* § 77t(d)(2). Under the first tier, the maximum penalty for a natural person is $11,823[71] for each statutory violation.

---

[70]    The Exchange Act and Advisers Act contain essentially identical civil penalty provisions, including the three-tier system. *Compare* 15 U.S.C. § 78u(d)(3); *id.* § 80b-9(e).

[71]    The civil penalty amounts are adjusted annually for inflation. 17 C.F.R. § 201.1001. The adjusted penalty amount applies to all penalties imposed after

*Id.* § 77t(d)(2)(A). The second tier allows a maximum penalty of $118,225 for a natural person, where the underlying violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id.* § 77t(d)(2)(B). The third and final tier permits a maximum penalty of $236,451,[72] provided that "the second-tier requirements are met and the 'violations directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.'" *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014) (quoting 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B)); *see also* 15 U.S.C. § 80b-9(e)(2)(C) (same).

"Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." *Monterosso*, 756 F.3d at 1338. The "Commission need only make 'a proper showing' that a violation has occurred and a penalty is warranted." *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008). Although the statute leaves the amount of the penalty to the discretion of the district judge, "courts consider numerous factors, including the egregiousness

---

the effective date of the adjustment, in this case those imposed after January 15, 2025. *Adjustments to Civ. Monetary Penalty Amounts*, Release No. 6808 (Jan. 7, 2025).

[72] The Court notes that the SEC made its request for a tier-three penalty before the most recent inflation adjustment, and thus its motion reflects the prior inflation-adjusted figure. *See Adjustments to Civ. Monetary Penalty Amounts*, Release No. 6521 (Jan. 5, 2024).

of the violation, the isolated or repeated nature of the violations, the degree of scienter involved, whether the defendant concealed his trading, and the deterrent effect given the defendant's financial worth." *SEC v. Miller*, 744 F. Supp. 2d 1325, 1344 (N.D. Ga. 2010) (citing *SEC v. Sargent*, 329 F.3d 34, 42 (1st Cir. 2003)). Other district courts in this circuit have also considered as factors the defendants' "failure to admit to their wrongdoing" and "lack of cooperation and honesty with authorities, if any." *SEC v. Huff*, 758 F. Supp. 2d 1288, 1364 (S.D. Fla. 2010), *aff'd*, 455 F. App'x 882 (11th Cir. 2012) (quoting *SEC v. Abellan*, 674 F. Supp. 2d 1213, 1222 (W.D. Wash. 2009)). The Securities Act and the Exchange Act authorize penalties for "each violation," so "courts are empowered to multiply the statutory penalty amount by the number of statutes the defendant violated, and many do." *Miller*, 744 F. Supp. 2d at 1345.[73]

The Court concludes that each Defendant's conduct qualifies for a tier-three penalty. Defendants consented to liability on the SEC's securities fraud claims against them,[74] and therefore their underlying violations plainly involve "fraud,

---

[73] The Advisers Act contains identical language, and therefore the reasoning of *Miller* would equally apply. *See also SEC v. Murray*, 2016 WL 6893880, at *9 (N.D. Cal. Nov. 23, 2016) (noting that "[p]rior courts have multiplied the per-violation penalties" for violations of the Securities Act, Exchange Act, and Advisers Act).

[74] Consent of Wright, ECF 42-1, ¶ 3; Consent of Flippen, ECF 42-2, ¶ 3; Consent of Mooney, ECF 53-1, ¶ 3.

deceit, manipulation, or deliberate or reckless disregard" of the securities laws.[75] The SEC has also shown that Defendants' actions "directly or indirectly resulted in substantial losses" to their clients,[76] as Defendants recommended that their clients invest or maintain upwards of $62 million in the Horizon III scheme, and Horizon III investors collectively suffered a net loss of approximately $68 million.[77] Having concluded that tier-three penalties are appropriate, the Court will consider the relevant factors as to each Defendant in determining the appropriate amount of each penalty.

### 1.    Defendant Mooney

Mooney did not file an opposition to the SEC's motion. However, Mooney did appear in person for oral argument on February 3, 2025 and proffered testimony to the Court.[78] In general, Mooney did not contest the SEC's case in support of the proposed civil penalty and disgorgement. Rather, Mooney expressed remorse to his former clients—many of whom he said were friends and fellow veterans—regarding the losses caused by the Horizon III scheme. Mooney

---

[75]    *See* Note 70, *supra.*

[76]    *Id.*

[77]    ECF 1, ¶ 4; ECF 57-11, ¶ 4.

[78]    Mooney was not placed under oath at oral argument, but the SEC agreed there is no evidence in the record contradicting Mooney's assertions. The Court found Mooney's proffer to be credible and credits his assertions as true for purposes of this Order.

also described his efforts to provide testimony supporting the various litigations being pursued by Horizon III investors, whom Mooney claims have largely been made whole. Mooney further spoke to his diminished financial condition: having sold his own house in the fallout of the Horizon III scheme, he currently lives in a house in Florida owned by his parents; he earns a modest income selling roofing services; he has a small sum in his bank account; and he owes approximately $50,000 in overdue debt.

### i.   The Egregiousness and Repeated Nature of the Violations

The Court concludes that Mooney's conduct was egregious and repeated. Mooney counseled his clients to invest over $27 million in Horizon III without doing any of his own due diligence into the fundamentals of the investment; in fact, Mooney was unfamiliar with any other investment that could provide a comparable rate of return compared to the low level of risk.[79] Mooney's sole source of information for this near-miraculous investment product was Woods, but Woods had also made several conflicting representations to Mooney about Horizon III.[80] Many of the clients Mooney steered into Horizon III were elderly investors seeking safe investments for their retirement assets,[81] yet Mooney staked

---

[79]   ECF 1, ¶¶ 4, 94, 95.

[80]   *Id.* ¶¶ 95–101.

[81]   *Id.* ¶ 30.

their financial security on the (at best) questionable credibility of Woods. Mooney's involvement with Horizon III also spanned eight years and two employers.[82] These factors weigh in favor of a stronger penalty.

### ii.    The Degree of Scienter Involved

The evidence presented shows that Mooney acted with a relatively high degree of scienter. "Scienter may be established by a showing of knowing misconduct or severe recklessness." *Monterosso*, 756 F.3d at 1335 (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982)). At a minimum, the evidence shows that Mooney acted with severe recklessness. At the same time that Mooney was receiving conflicting representations from Woods about the operations of Horizon III and Southport, he was relying on Woods as the sole source of information to recommend that his clients invest in Horizon III. Indeed, the purported investment thesis for Horizon III was that it provided unusually strong returns compared to its minimal levels of risk. Additional evidence indicates that Mooney may have had actual knowledge of Horizon III's underlying fraud but was placated by his own profiting from the scheme.[83] Regardless of whether

---

[82]    *Id.* ¶¶ 60–62.

[83]    ECF 57-14 (Mooney told Woods "Don't get me wrong I appreciate the pay but I'm also aware that there is moderate risk for me when this unwinds someday. I figure no contract, no questions asked would come at a premium to Horizon."); ECF 57-15 (Mooney told Woods "It's been 8 years and I have never

Mooney had actual knowledge of the true extent of the Horizon III scheme, at the very least he demonstrated severe recklessness as to the truth of Horizon III's representations before steering his clients to invest in it. This factor weighs in favor of a stronger civil penalty.

### iii.   The Deterrent Effect Given Defendants' Financial Worth

On the other hand, Mooney has demonstrated that he is unlikely to be able to pay a civil penalty. The Court has already ordered Mooney to pay $793,391 in disgorgement and $300,571 in prejudgment interest,[84] because "ability to pay is not a defense to disgorgement." *SEC v. Molen*, 704 F. Supp. 3d 1341, 1346 (N.D. Ga. 2023) (citing *Warren*, 534 F.3d at 1370; *Calvo*, 378 F.3d at 1217). Mooney's proffered statements at oral argument demonstrate that he is already indebted, has minimal assets, and earns a modest income. While it is true that "[a]t most, ability to pay is one factor to be considered in imposing a penalty," *Warren*, 534 F.3d at 1370, for Mooney this factor weighs in favor of a lighter penalty.

### iv.   Other Factors

The Court grants credit to Mooney's showing of remorse and descriptions of his efforts to provide testimony supporting the various litigations being

---

even met Bill Kahn [Horizon III's purported fund manager]. That's okay because I have enjoyed the money.").

[84]   *See* Section III.A–B, *supra*.

pursued by Horizon III investors. As one factor among many, this weighs in favor of a lighter penalty.

Having considered the relevant factors, the Court concludes that a single tier-three civil penalty against Mooney in the amount of $230,464, as requested by the SEC, is appropriate.

### 2.    Defendants Wright and Flippen

Because Wright and Flippen's admitted conduct is similar in nature, and they have filed a joint opposition to the SEC's motion for remedies, the Court will consider their arguments together before imposing individual penalties. The SEC seeks a single tier-three penalty against both Wright and Flippen, each in the amount of $230,464. Wright and Flippen filed an opposition, arguing primarily that other parties, particularly the SEC, Woods, Mooney, and Oppenheimer, deserve most of the blame for the Horizon III scheme.[85] Wright and Flippen also presented evidence of their diminished financial condition and noted their testimony in support of Horizon III victims' claims in other litigation.[86] At oral argument, Wright and Flippen each testified under oath as to the personal repercussions of this case, as well as some of the reasons that they failed to

---

[85]    *See generally* ECF 60.

[86]    ECFs 61-1, 61-2; ECF 60, at 6–7.

recognize the Horizon III scheme. The Court found Wright and Flippen's testimony to be credible in all material respects.

Wright and Flippen contend that "the factors used to impose civil penalties . . . all argue that no civil penalties should be assessed against" them, although they also argue that "[a]t most a second-tier penalty should be imposed in this case."[87] As stated previously, the Court concludes that Wright and Flippen's admitted conduct in this case qualifies for a tier-three penalty,[88] but the Court will make an independent determination as to the appropriate *amount* of the penalty. As it must, the Court turns to the relevant factors.

### i.  The Egregiousness and Repeated Nature of the Violations

The Court concludes that Wright and Flippen's conduct was egregious and repeated. Like Mooney, Wright and Flippen counseled their clients to invest tens of millions of dollars in Horizon III without doing any of their own due diligence into the fundamentals of the investment.[89] Wright and Flippen had no experience offering private equity investments to clients, yet they did not conduct any research into the characteristics of these investments before recommending

---

[87]  ECF 60, at 18 (cleaned up), 24.

[88]  *See* Section III.C, *supra*.

[89]  ECF 1, ¶¶ 64–65, 104.

them.[90] Nor were they familiar with the types of documents that were commonly part of private equity investments, much less the Private Placement Memorandum applicable to Horizon III.[91] When Wright and Flippen did ask Woods for information regarding Horizon III's underlying investments, they received a series of evasive answers, but no documents.[92] They never questioned how Horizon III could offer guaranteed returns of at least 6% when they understood the underlying investments to pay only 2–3% interest, nor did they adequately question the numerous other red flags surrounding Woods and Horizon III: the lack of documentation, shifting explanations from Woods, undisclosed compensation, and private emails.[93] Nevertheless, over eight years, Wright and Flippen counseled their clients to invest and maintain retirement assets in Horizon III, telling them it was an extremely safe investment without any documents or due diligence to indicate that was true.[94] These factors weigh in favor of a stronger penalty.

---

[90]  *Id.* ¶¶ 9, 111.

[91]  *Id.* ¶ 114; Wright Depo. Tr., ECF 57-9, at 132:20–133:24; Flippen Depo. Tr., ECF 57-10, at 91:9–92:16, 98:23–102:11.

[92]  ECF 1, ¶¶ 105–08, 112, 113.

[93]  *Id.* ¶¶ 68, 93, 104–08, 112–14.

[94]  *Id.* ¶¶ 4, 30, 63–65, 90.

### ii. The Degree of Scienter Involved

The Court concludes that Wright and Flippen acted with a comparatively low degree of scienter. Indeed, the SEC has not presented any evidence that Wright and Flippen had actual knowledge that the representations made regarding Horizon III were false.[95]

At oral argument, Wright and Flippen acknowledged that they had a fiduciary duty to provide competent and unbiased financial advice to their clients, a duty that they breached by counseling their clients to invest and maintain over $35 million[96] in Horizon III without any documentation or due diligence to support their recommendations. At the same time, the Court notes that Wright and Flippen have raised legitimate questions as to the role played by other non-parties to this enforcement action—Oppenheimer in particular—in lending an air of legitimacy to the Horizon III scheme, though the factual record on this point is admittedly undeveloped. Wright and Flippen's conduct in this case satisfies the statutory scienter requirement of severe recklessness, but the lack of any indication that they acted with actual knowledge counsels in favor of a lighter penalty.

---

[95] ECF 57-1, at 13.

[96] By mid-2021, Wright's clients had approximately $25 million invested in Horizon III, and Flippen's clients invested approximately $10 million. ECF 1, ¶¶ 64–65.

### iii.    The Deterrent Effect Given Defendants' Financial Worth

Wright and Flippen each filed under seal financial statements showing their recent income, assets, and outstanding liabilities.[97] For the purposes of this Order, suffice it to say that Wright is currently unemployed, having last worked in 2021 (for Southport and associated entities), and his assets are vastly outweighed by his outstanding liabilities.[98] At oral argument, Wright testified credibly under oath to the same. Accordingly, it is unlikely that Wright will be able to pay any civil penalty ordered.

Flippen is in a relatively better financial position, though she is unemployed, and her spouse is retired.[99] Flippen reported a modest income in 2023.[100] Flippen also disclosed assets greater than her liabilities, though the assets, consisting almost entirely of real estate, vehicles, and household goods, are held jointly.[101] Her testimony before the Court, likewise credible, was consistent on this point. The Court therefore concludes that Flippen is unlikely to be able to pay a civil penalty from her personal income or assets held individually.

---

[97]   ECFs 61-1, 61-2.

[98]   ECF 61-1.

[99]   ECF 61-2.

[100]   *Id.*

[101]   *Id.*

Countervailing considerations to Wright and Flippen's inability to pay include that "the purpose of civil monetary penalties is both punishment and deterrence," and thus "poverty alone cannot defeat the need for penalties in this case"; additionally, "a party's financial position is fluid," such that "the SEC may be able to collect on these penalties in the future" if Wright and Flippen's financial conditions improve. *Molen*, 704 F. Supp. 3d at 1348–49. As one factor among many, Wright and Flippen's inability to pay weighs in favor of a lighter penalty.

### *iv.* **Other Factors**

Lastly, the Court will address the remaining contentions of the parties. Wright and Flippen's opposition primarily seeks to shift the blame for Horizon III investors' losses to others, most notably the SEC, Woods, and Oppenheimer.[102] According to Wright and Flippen, the SEC failed to discover the Horizon III scheme during an audit, and then ultimately exacerbated the losses of Horizon III investors by initiating the enforcement action against Southport.[103] Even assuming these facts to be true, they carry limited weight in this analysis. The SEC's (or Oppenheimer's, or Southport compliance personnel's) alleged failure to catch the Horizon III scheme earlier does not change the admitted facts that Wright and Flippen recklessly advised their clients to invest and maintain over $35 million in

---

[102] *See generally* ECF 60.

[103] *Id.* at 10–13, 16–18.

a too-good-to-be-true investment scheme, without supporting documentation or due diligence, all while ignoring Woods's red flags. At a minimum, this conduct "created a significant risk of substantial losses to" Horizon III investors. *Monterosso*, 756 F.3d at 1338 (quoting 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B)). Thus, a civil penalty is clearly warranted.

The parties disagree as to whether Wright and Flippen have adequately accepted responsibility for their conduct.[104] By agreeing to bifurcated settlements, Wright and Flippen obviated the need for the SEC to file dispositive motions or take this case trial. At the same time, in the settlements Wright and Flippen did not admit the allegations of the complaint, except for the purposes of determining the appropriate remedy.[105] Simply put, this dispute does not move the analysis significantly in one direction or the other.

Having considered the relevant factors, the Court concludes that the following penalties are appropriate: (1) a tier-three civil penalty against Wright in the amount of $84,000; and (2) a tier-three civil penalty against Flippen in the amount of $36,000. These amounts are equivalent to one year's salary payments made to each by Horizon III. The Court concludes that these amounts,

---

[104]   *Compare* ECF 57-1, at 14–15, *with* ECF 60, at 22–23.

[105]   Consent of Wright, ECF 42-1, ¶¶ 2, 11; Consent of Flippen, ECF 42-2, ¶¶ 2, 11.

representing a total of $120,000, account for the relevant factors and Defendants'
varying degrees of culpability and financial involvement.

## IV.    Conclusion

The SEC's motion for monetary relief [ECF 57] is **GRANTED AS
FOLLOWS**. Defendant Michael Mooney is **ORDERED** to pay a civil penalty in the
amount of $230,464, disgorgement in the amount of $793,391, and prejudgment
interest in the amount of $300,571. Defendant Britt Wright is **ORDERED** to pay a
civil penalty in the amount of $84,000. Defendant Penny Flippen is **ORDERED** to
pay a civil penalty in the amount of $36,000. Final Judgment against the
Defendants consistent herewith will be entered separately.

The Clerk of Court is **INSTRUCTED** to enter final judgments consistent
therewith and close this case.

**SO ORDERED** this 25th day of March, 2025.

Steven D. Grimberg
United States District Judge